UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRETT BOSTON,

                                Plaintiff,

                - against -

TACONIC EASTCHESTER MANAGEMENT
LLC and SAVATH PAUV,

                                Defendants.

**OPINION AND ORDER**

12 Civ. 4077 (ER)

Ramos, D.J.:

Plaintiff Brett Boston brings this action against Taconic Eastchester Management LLC ("Taconic") and Savath Pauv (together, "Defendants"), alleging employment discrimination on the basis of his race, color, and age, and retaliation for complaining about Pauv's discriminatory comments and treatment.  Plaintiff brings his claims pursuant to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 ("ADEA"), New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL"). Before this Court is Defendants' motion for summary judgment.  For the reasons discussed below, Defendants' motion is GRANTED.

I.    **Background**[1]

In 1988, Plaintiff, an African American man, began working at the Hillside Homes apartment complex, now known as Eastchester Heights.  Def. 56.1 ¶ 1.  Plaintiff worked as a

---

[1] The following facts are drawn from the Amended Complaint (Doc. 43), Defendants' Rule 56.1 Statement of Undisputed Material Facts (Doc. 72), and Plaintiff's Rule 56.1 Counter-Statement in Opposition to Defendants' motion for summary judgment (Doc. 76), and the parties' supporting submissions.

superintendent and lived in the apartment complex.  *Id.* at ¶ 4, Pl. Counter ¶ 43.  Plaintiff was

also a member of the Service Employees International Union.  Def. 56.1 ¶ 6.  Plaintiff reported

to Julio Barrios, the Assistant Maintenance Manager.  *Id.* at ¶ 4.  Savath Pauv, a Cambodian man

and the Maintenance Manager of the apartment complex, oversaw the entire maintenance staff,

including six superintendents and nine handymen, *id.* at ¶ 7, though Plaintiff was the only

African American superintendent under Pauv's supervision.  *Id.* at ¶ 85.  Taconic took over the

management of the Eastchester Heights maintenance staff in 2007.  *Id.* at ¶ 2.

**Plaintiff's Responsibilities as Superintendent**

As a superintendent, Plaintiff was responsible for, among other things, repairing

apartments, installing light fixtures and shower heads, and connecting stoves.  *Id.* at ¶ 3.  He

received his assignments via work orders issued by Pauv or Barrios, which identified the

apartment requiring maintenance and listed the supplies and materials necessary to perform the

assigned tasks.  *Id.* at ¶¶ 19-20.  During his tenure, Plaintiff received warnings from several

Taconic managers and employees regarding his performance and compliance with Taconic's

policies.  For example, Scott Black, the Assistant General Manager from 2009-2011 – and

another African American man – issued Plaintiff a warning and suspended him for being late to

respond to a call regarding a flood in a tenant's apartment, performing side work for tenants for

compensation, failing to submit an overtime report, and failing to adhere to Taconic's dress code.

*Id.* at ¶ 10.  Black informed David Woodruff, Director of Operations beginning in 2008, of

Plaintiff's various transgressions.  *Id.* at ¶ 9.  Plaintiff also received counseling statements from

Pauv for failing to keep his grounds clean and for requesting overtime pay for a job he had not

completed and which resulted in a flood.  *Id.* at ¶¶ 11-12.  Plaintiff was also disciplined by

another Taconic supervisor for failing to complete his work orders.  *Id.* at ¶ 13.  Woodruff

testified that other managers also complained that Plaintiff's plumbing work was sloppy and that he could not perform the basic tasks expected of a superintendent.  *Id.* at ¶ 17.

**Plaintiff's Allegations of Discrimination**

All Taconic employees were required to abide by its anti-discrimination policy.  *Id.* at ¶ 79.  Under the policy, if a Union employee believed that he had been discriminated against, he could report the incident to the Union, to Woodruff, or to one of the managers at Eastchester Heights.  *Id.* at ¶ 82.  If an employee believed that his own supervisor was discriminating against him, the employee could speak directly with that person's supervisor.  *Id.* at ¶ 83.  Plaintiff was specifically familiar with his Union's grievance procedures because he had previously served as an assistant shop steward.  *Id.* at ¶ 102.

Although Plaintiff acknowledged that Taconic management, *i.e.* Woodruff, had never discriminated against him, Plaintiff alleges that Pauv discriminated against him in several ways, including,

- In 2008 or 2009, Pauv assigned Plaintiff the task of delivering refrigerators and stoves for a four-month period.  *Id.* at ¶ 94(a).  Pauv also asked Plaintiff to apply water protectant on a roof landing to stop a leak.  *Id.* at ¶ 94(g).  He was the only superintendent asked to perform these tasks.  *Id.* at ¶¶ 94(a), 94(g).

- Pauv asked Plaintiff why he was "just standing around" when there had been a gas leak at one of the apartment buildings.  *Id.* at ¶ 94(i).  Plaintiff claims that Pauv made this comment after he had been working with ConEd workers for two hours prior to Pauv's arrival and that Pauv did not similarly chastise a colleague who was present and not African American.  *Id.*

- From 2009 until Plaintiff's termination, Pauv made comments about Plaintiff's hair, which he wore in dreadlocks.  *Id.* at ¶ 94(b).  Pauv also warned Plaintiff that if he did not wear the Taconic uniform hat, he could not wear any hat all.  *Id.* at ¶ 94(c).  Plaintiff claims this statement was racially charged because he overheard Pauv state to coworkers that Plaintiff had a lot of hair and could not fit in the Taconic hat.  *Id.* at ¶¶ 94(b)-(c).  Pauv commented on Plaintiff's hair on at least ten occasions.  *Id.*

- Pauv compared Plaintiff to other African American men with dreadlocks in the neighborhood.  He would say "oh, that looks like [Plaintiff]."  This happened three to four times in 2009.  Pl. Counter ¶ 94(c).

- Pauv also told Plaintiff that he smoked too many cigarettes and commented to another superintendent that a cigarette box on the roof of a building belonged to Plaintiff even though it was nowhere near the buildings for which Plaintiff was responsible.  *Id.* at ¶¶ 94(d)-(e).

- Pauv criticized Plaintiff's Timberland boots as inappropriate but allowed a Union steward to wear similar Timberland boots.  Def. 56.1 ¶ 94(f).

Defendants claim that Pauv never discriminated against Plaintiff.  *Id.* at ¶ 88. Specifically, Pauv denies ever having made any comments about Plaintiff's hair, *id.* at ¶ 96(c), and that Black, not Pauv assigned Plaintiff the task of delivering refrigerators and stoves.  *Id.* at ¶ 94(b).  When Plaintiff questioned this assignment, Pauv referred Plaintiff to Black, who confirmed that he had assigned Plaintiff this task because of his skillset and that all superintendents are asked to perform this task at one time or another.  *Id.* at ¶¶ 96(a)-(b), 99.  In fact, Plaintiff does not dispute that Pauv considered Plaintiff "family," and lent him money for food and clothes for his family.  Def. 56.1 ¶ 90.  Pauv also readily granted Plaintiff's overtime requests.  *Id.*  Additionally, Plaintiff acknowledged that Pauv had never called Plaintiff any derogatory names and that he had never heard Pauv make any comments about the race of anyone at work.  *Id.* at ¶¶ 91-92.

Plaintiff never filed a complaint with his Union or Taconic about Pauv's comments nor did he at any time allege discrimination.  He complained only to his coworkers about his dissatisfaction and acknowledged that he never told Pauv that his comments about his hair were discriminatory.  *Id.* at ¶¶ 103-04.

**Plaintiff's Termination**

In 2011, due to a high level of theft, Taconic instituted a zero-tolerance policy and consolidated all of its supplies and materials into one large supply room in its management building.  *Id.* at ¶ 21.  Though the record is unclear about whether Plaintiff was specifically aware of Taconic's zero-tolerance policy, Plaintiff does not dispute that he signed a Code of Ethics when he began his employment and thereafter, which provided that taking items belonging to the management company without proper authorization was prohibited and grounds for termination.  *Id.* at ¶¶ 65-66; Pl. Dep. Tr. 130:3-17.

Taconic also adopted procedures by which employees were required to obtain supplies. *Id.* at ¶ 21.  For a superintendent to obtain the supplies needed to fulfill a work order, he had to first contact a supply room attendant who accompanied the superintendent into the supply room. *Id.* at ¶ 22.  Superintendents were required to show a work order which specified which supplies were needed, including cleaning supplies.  *Id.* at ¶ 24; Woodrow Dep. Tr. 109:10- 111:22.  After a superintendent obtained the necessary supplies, the supply room attendant checked the items against the work order.  Def. 56.1 ¶ 24.  The supply room attendant also entered all items that left the supply room into a logbook.  *Id.* at ¶ 25.  If a superintendent left the room with supplies not included in the work order, the supply room attendant had to report the incident to his supervisor. *Id.* at ¶ 26.  As a superintendent, Plaintiff never took cleaning supplies from the room without a work order, unless specifically instructed to do so by Barrios or Pauv.  *Id.* at ¶ 35.  After Plaintiff's four-month period of delivering refrigerators and stoves, neither Barrios nor Pauv ever requested that he retrieve cleaning supplies.  *Id. at* ¶ 37.

On the afternoon of March 8, 2012, Pauv gave Plaintiff a work order to replace lightbulbs in a hallway.  *Id.* at ¶ 27.  Plaintiff contacted Brian Bier, a supply room attendant, and informed

him that he needed light bulbs, Tilex, and Pine Sol.  *Id.* at ¶¶ 28-29.  Tilex and Pine Sol, brand name cleaning products, were not listed in Plaintiff's work order.  *Id.* at ¶ 30.  Realizing that the cleaning supplies were not included in the work order, Bier asked Plaintiff where he was taking these items.  *Id.* at ¶ 32.  Plaintiff responded that he was taking the supplies "to his building," to "maintain [his] floor."  *Id.* at ¶¶ 32-33.  Defendants claim that Bier warned Plaintiff about taking the cleaning supplies without permission, *id.* at ¶ 34, however, Plaintiff claims that Bier never alerted him and did not physically prevent him from taking the cleaning supplies.  Pl. Counter ¶ 34.  Plaintiff then placed the lightbulbs and cleaning supplies into a bag.  Def. 56.1 ¶ 38.

As Plaintiff left the supply room, Plaintiff and Bier encountered Pauv who, having issued the work order and knowing that Plaintiff needed only lightbulbs, asked Plaintiff why his bag was "so large."  *Id.* at ¶ 38.  Plaintiff responded that he had taken not only the lightbulbs, but also Pine Sol and Tilex.  *Id.*  Bier added that Plaintiff was taking these supplies home with him.  *Id.* at ¶ 39.  In response, Pauv immediately told Plaintiff to return the cleaning supplies and instructed Bier to notify Bier's boss if Plaintiff did not comply.  *Id.*  Defendants allege that Plaintiff reacted by saying "I'll take my chances."  *Id.* at ¶¶ 40-41.  However, Plaintiff denies ever saying this.  Pl. Counter ¶¶ 40-41.

Bier notified Agim Duraku, the Assistant General Manager of the complex, of Plaintiff's actions and also added the supplies taken by Plaintiff into the logbook. [2]  Def. 56.1 ¶¶ 43-44. Duraku informed Woodruff, who contacted Bier directly to confirm what had transpired.  *Id.* at ¶¶ 45-46.  Bier told Woodruff that Plaintiff had taken the cleaning supplies despite Bier's

---

[2] It is unclear when Bier logged this information.  Defendants claim that Bier entered this information into the logbook after he informed Duraku of what had transpired.  Def. 56.1 ¶ 43.  Plaintiff insists that he witnessed Bier enter the information into the logbook and even handed Bier identification for the record.  Pl. Counter ¶ 43.

warnings.  *Id.*  After speaking with Bier, Woodruff called both Peter Febo, the Chief Operating

Officer of Taconic, and Dan McInerney, the Vice President of Taconic Investment Partners,

who, together decided to terminate Plaintiff.  *Id.* at ¶¶ 48-49.  After reaching this decision but

before informing Plaintiff, Woodruff spoke with Pauv, who he knew had witnessed part of the

interaction between Bier and Plaintiff.  *Id.* at ¶ 50.  During this conversation, Pauv told Woodruff

that he had not personally seen Plaintiff take the items, but that Bier had informed him that he

had.  *Id.* at ¶ 60.

Later that day, Plaintiff was called into Woodruff's office, where Woodruff, Barrios, and

his Union representative awaited him.  *Id.* at ¶ 56.  Defendants claim that at this meeting,

Woodruff told Plaintiff that he was being terminated for the theft of the cleaning supplies and

that he, Febo, and McInerney had made the decision together.  *Id.* at ¶ 57.  Plaintiff disputes this

account and claims that Woodruff did not inform him of the reason for his termination at that

time.  Pl. Counter ¶ 57.  Plaintiff acknowledged that no discriminatory comments were made

during this meeting and that Woodruff had never said or done anything that made him feel

discriminated against on the basis of his race or color.  *Id.* at ¶¶ 59, 67.

After the meeting, and at Pauv's request, Plaintiff returned the cleaning supplies to

Woodruff.  *Id.* at ¶ 61.  Plaintiff claims that it was only after Pauv's request that he "speculated"

that his termination was related to the Tilex and Pine Sol and explained to Woodruff that he was

only planning on using the cleaning supplies to clean the hallway outside of his apartment.  *Id.* at

¶¶ 62-63.  However, Woodruff did not believe Plaintiff's explanation.  Woodruff Dep. Tr.

153:17-154:25.

After his termination, Plaintiff filed a grievance with his Union, in which he claimed that

he was unjustly discharged, but did not claim discrimination.  *Id.* at ¶¶ 68-69.  A grievance

meeting was held.  *Id.* at ¶ 71.  Plaintiff claims that he spoke with his Union representative right before this meeting and raised the topic of discrimination, stating that he was the only African American who had been assigned to move stoves and refrigerators and that he believed Pauv "had it out" for him.  *Id.* at ¶ 73.  The Union representative warned him that Taconic was a "tough" company that had previously fired an employee for "asking for a can of soda."  *Id.* at ¶ 72.

During the grievance meeting neither the Union nor Plaintiff raised any discrimination claims.  *Id.* at ¶ 76.  At the end of the meeting, Febo informed Plaintiff and his Union representative that Taconic was standing by its termination decision and offered Plaintiff money and moving expenses.  *Id.* at ¶¶ 74-75.  Thereafter, Plaintiff received a letter from the Union declining to take his grievance to arbitration because it lacked sufficient merit for the Union to likely prevail.  *Id.* at ¶ 77.  Plaintiff was never replaced and his position was ultimately eliminated.  *Id.* at ¶ 98.

In July 2012, Plaintiff filed a complaint with the Department of Labor ("DOL"), which found that Plaintiff was disqualified from receiving unemployment benefits due to his misconduct.  Declaration of Patricia L. Boland in Opposition (Doc. 75) Ex. E at 1.  After a hearing, the Administrative Law Judge ("ALJ") overruled this decision.  *Id.*  Taconic appealed the decision to the New York State Unemployment Insurance Appeals Board ("NYS Appeals Board"), which affirmed the ALJ's findings and allowed Plaintiff to receive benefits.  *Id.* at 2.

## II.   **Procedural History**

Plaintiff filed a complaint with the Equal Employment Opportunities Commission and received a right to sue letter on May 14, 2012.  Plaintiff timely filed a *pro se* complaint on May

22, 2012 (Doc. 2).  On September 3, 2014, after securing counsel, Plaintiff filed an Amended

Complaint asserting Title VII, ADEA, NYSHRL and NYCHRL discrimination, hostile work

environment, retaliation, and aider and abettor claims stemming from his March 8, 2012

termination (Doc. 43).  On September 1, 2015, the parties stipulated that Plaintiff would

withdraw any claims of discrimination on the basis of age pursuant to the ADEA, NYSHRL, and

NYCHRL (Doc. 64).

## III.   Legal Standard:

### A.   General Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno*

*v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint*

*Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might

"affect the outcome of the litigation under the governing law."  *Id.* (quoting *Miner v. Clinton Cty.*

*N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary judgment is first

responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party

must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in

order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504

(S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536

F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Nonetheless, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).  "[W]hen an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer."  *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citing *Budde v. H & K Distrib. Co.*, 216 F.3d 1071 (2d Cir. 2000)).

## IV.   <u>Discussion</u>

### A.  Analytical Framework for Title VII Claims

Plaintiff's Title VII claims for race and color discrimination, hostile work environment, and retaliation are properly analyzed under the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59 (2d Cir. 2015) (applying *McDonell Douglas* analysis to Title VII discrimination claims on the basis of plaintiff's gender, race, and national origin); *see also Chick v. Cty. Of Suffolk*, 546 F. App'x 58, 59 (2d Cir. 2013) (summ. order) (applying *McDonnell Douglas* analysis to hostile work environment claim); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (applying *McDonell Douglass* framework to retaliation claim).  Under the *McDonnell Douglas* framework, a plaintiff bringing a Title VII claim must first (1) demonstrate a *prima facie* case, whereupon (2) the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for the adverse employment action, at which point (3) the burden shifts back to plaintiff to prove by a preponderance of the evidence that the proffered reason is pretextual.  *See Brenner v. City of New York Dep't of Educ.*, No. 15 Civ. 3230, 2016 WL 4703889, at *1 (2d Cir. Sept. 8, 2016) (citing *McDonnell Douglas*, 411 U.S. at 802).

However, case law makes clear that the court may assume that a plaintiff has established a *prima facie* case and "skip to the final step in the analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action."  *Sattar v. Johnson*, 129 F. Supp. 3d 123, 138 (S.D.N.Y. 2015) (declining to determine whether plaintiff established a *prima facie* case for Title VII claims because defendant had provided a legitimate reason why plaintiff was not hired); *see also Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (declining to decide whether a prima facie case was made out because defendant "met

its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination, and [plaintiff] has failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact").

### i.   Defendants Have Proffered a Legitimate Business Reason

Even assuming that Plaintiff has established a *prima facie* case of discrimination, Defendants have articulated a legitimate nondiscriminatory reason for Plaintiff's termination, namely Plaintiff's theft of cleaning materials.  Def. Memo. at 9-10; *see Jowers v. Family Dollar Stores, Inc.*, No. 09 Civ. 2620 (WHP), 2010 WL 3528978, at *3 (S.D.N.Y. Aug. 16, 2010), *aff'd*, 455 F. App'x 100 (2d Cir. 2012) (finding that defendant's allegation of theft constituted a valid reason for termination); *Crews v. Trs. of Columbia Univ.*, 452 F. Supp. 2d 504, 523 (S.D.N.Y. 2006) (finding theft to be a legitimate, non-discriminatory reason for plaintiff's termination); *Sergilus v. Covenant House Under 21*, 96 Civ. 6210, 1999 WL 717274 at *1 (S.D.N.Y. Sept.15, 1999) ("Theft is a legitimate, nondiscriminatory reason to discharge an employee.").

Accordingly, Defendants' legitimate, nondiscriminatory reason for Plaintiff's termination shifts the burden back to Plaintiff to establish discriminatory intent.

### ii.   Plaintiff is Unable to Establish Pretext

To meet his burden and defeat a motion for summary judgment, Plaintiff must demonstrate that either "a discriminatory motive, more likely than not," motivated Defendants' adverse employment actions or that "the reasons given by the defendants are not true and that discrimination is the real reason."  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  At this step, courts must engage in a "cumulative inquiry" of a plaintiff's proffer and not insist that a single piece of evidence "bear the full weight of a plaintiff's burden."  *Walsh v. N.Y.*

*City Housing Authority*, 2016 WL 3632245, at *3 (2d Cir. July 7, 2016).  "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that a defendant's employment decision was more likely than not motivated in part by discrimination." *Id.* at *5.

Here, Plaintiff attempts to establish an inference of discrimination by using three different theories:  (1) Plaintiff argues that he did not actually steal the cleaning supplies.  He asserts that Bier gave him the cleaning supplies as evidenced by the fact that Bier entered the items into the logbook,[3] and that it was common practice for Plaintiff to take the cleaning supplies without a work order, Pl. Opp. at 15-16; (2) Plaintiff claims that the "cat's paw" theory of liability applies and imputes liability to Taconic for Pauv's alleged discriminatory intent, *id.* at 14; and (3) Plaintiff claims that the NYS Appeals Board's finding that Plaintiff was "unjustly discharged" and thus eligible for unemployment benefits reveals that the real reason for his termination was pretextual.  *Id.* at 17.  The Court will address each claim in turn.

First, the record indicates that Plaintiff did, in fact, take the cleaning supplies without authorization.  The Pine Sol and Tilex were not in Plaintiff's work order, Def. 56.1 ¶ 30, and he was warned by Bier and Pauv that he was not allowed to take these items.  *Id.* at ¶¶ 38-39.  Plaintiff's claim that it was common practice for him to take items from the supply room is also wholly unsupported by the record; in fact his own deposition testimony rebuts that assertion.

---

[3] Plaintiff also alleges that Defendants did not conduct a "meaningful investigation" because they did not consider video evidence of Plaintiff providing his identification for Bier to include in the logbook.  Pl. Opp. at 7.  This evidence, Plaintiff claims, shows that he did not take the items, but rather helped Bier log them.  Pl. Counter ¶ 72.  However, this is insufficient to establish pretext.  Moreover, the record shows that Woodruff reasonably consulted with several people, including Duraku, Bier, Febo, and McInerney before the final decision was made to terminate Plaintiff.  *See Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06 Civ. 5474 (JGK), 2008 WL 857492, at *11 (S.D.N.Y. Mar. 31, 2008) (rejecting plaintiff's claim that defendant did not "investigate meaningfully" because defendant had reached a reasoned response after consulting with various employees).

Plaintiff testified that he had never taken cleaning supplies from the room without a work order, unless instructed to do so by Barrios or Pauv. *Id.* at ¶ 35. Also, after the period in which Plaintiff delivered refrigerators and stoves in 2009 (at the latest), Barrios and Pauv never asked Plaintiff to get cleaning supplies. *Id.* at ¶ 37. Lastly, even though Plaintiff disagrees with Taconic's decision to terminate him over taking the Tilex and Pine Sol, especially considering his "years of loyal service," Pl. Opp. at 1, whether Taconic's reason to terminate Plaintiff was "a good reason, a bad reason, [or] a reason based on erroneous facts," does not matter, so long as Taconic's reasons were not discriminatory. *See Altman v. New Rochelle Pub. Sch. Dist.*, No. 13 Civ. 3253 (NSR), 2016 WL 3181153, at *4 (S.D.N.Y. June 2, 2016) (citing *DeLuca v. Allied Domecq Quick Serv. Rests.*, No. 03 Civ. 5142 (JFB) (AKT), 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006)). And, here, Plaintiff is unable to show that discrimination was the real reason for his termination.[4]

Second, Plaintiff's contention that the "cat paw's" theory of liability applies and Pauv's discriminatory animus can be imputed to Taconic is also unavailing. Pl. Opp. at 14-15; *see also* Doc. 83 (September 12, 2015 letter from Plaintiff). Just last month, the Second Circuit in *Vasquez v. Empress Ambulance Service, Inc.*, 2016 WL 4501673 (2d Cir. Aug. 29, 2016),

---

[4] Plaintiff also insists that the fact that he was terminated, but Bier received no discipline for allowing a theft to occur "on his watch" provides evidence of pretext. Pl. Opp. at 11. However, as Defendants correctly note, Bier is not an appropriate comparator. Def. Reply at 8. The record is clear that Plaintiff – who took the cleaning supplies – and Bier – who did not physically stop him – did not engage in similar actions. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (holding that for disparate treatment claim, plaintiff must show that similarly situated employee who went undisciplined engaged in *comparable conduct*) (emphasis added). Moreover, the record indicates that Bier followed Taconic's policies, pursuant to which he logged the items not in the work order and immediately reported the incident to a supervisor. Def. 56.1 ¶¶ 26, 43. The fact that Bier followed protocol in no way proves that he assented to Plaintiff's conduct.

recognized the "cat's paw" theory of liability for Title VII claims and held that an employer is liable only if it negligently gave effect to an employee's unlawful animus.  *Id.* at *4.

In *Vasquez*, plaintiff, an employee at Empress Ambulance Service, Inc. ("Empress") complained to a supervisor about a coworker's repeated attempts to flirt with her, his inappropriate touching, and an indecent picture he sent to her phone.  *Id.* at *2-*3.  The coworker learned about plaintiff's complaint and while she waited to speak to the Human Resources ("HR") department, the coworker went directly to HR with a fabricated text message exchange and photo alleging that plaintiff had sexually harassed him.  *Id.*  When plaintiff spoke to HR, they informed her that they had received proof of plaintiff's inappropriate conduct, rejected any of her attempts to rebut his proof, and fired her for sexual harassment.  *Id.*  The District Court dismissed plaintiff's Title VII retaliation claim holding that Empress could not be held responsible for the retaliatory animus of a low-level employee without decision-making authority.  *See Vasquez v. Empress Ambulance Service, Inc.*, 2015 WL 5037055, at *7 (S.D.N.Y. Aug. 26, 2015).  On appeal, the Second Circuit vacated and remanded the District Court's decision holding that a reasonable person could find that Empress "knew or should have known" that the coworker's accusations "were the product of retaliatory intent and thus should not have been trusted."  *Vasquez*, 2016 WL 4501673, at *7.  Specifically, the fact that the coworker knew that plaintiff had accused him of sexual harassment, that only six hours had elapsed between her accusations and the coworker's claims, and that the coworker had conveniently printed copies of the alleged sexual exchange between him and the plaintiff, provided Empress "with reason to distrust" the coworker's account.  *Id.*  Nonetheless, Empress chose to "ignore these warning signs and instead blindly credited" the coworker's account.  *Id.*

Applying the Second Circuit's analysis here, Plaintiff is unable to show that Taconic negligently relied on Pauv's discriminatory intent in making its termination.  Even assuming Pauv harbored discriminatory animus towards Plaintiff – a proposition that the record does not support – Plaintiff is unable to show that Taconic negligently relied on Pauv's statements. Plaintiff does not dispute that it was Bier who initiated the report against Plaintiff by calling Bier's supervisor, Duraku.  Def. 56.1 ¶ 43.  After Duraku notified Woodruff, Woodruff contacted Bier, Febo, and McInerney to discuss the details of the incident, not Pauv.  *Id.* at ¶¶ 45-49.  It was only *after* Woodruff, Febo, and McInerney made their decision to terminate Plaintiff, that Woodruff spoke to Pauv.  Pl. Counter ¶ 50.

Plaintiff attempts to discredit these undisputed facts by citing to deposition testimony in which Woodruff agreed that "based" on his conversations with Duraku, Pauv, Febo, and McInerney, Plaintiff was terminated.  Pl. Counter ¶ 96(i).  However, Plaintiff does not challenge – and Woodruff's testimony makes clear – that the termination decision was made by Woodruff, Febo, and McInerney, before Woodruff spoke to Pauv.  Nevertheless, even assuming that Pauv's comments could have affected Taconic's decision to terminate Plaintiff, nothing in the record indicates that Pauv made any disparaging or untrue remarks.  *Id*.  Pauv simply told Woodruff that he had not seen Plaintiff take the cleaning supplies, but that Bier told him that he had.  Def. 56.1 ¶ 60.  Accordingly, no reasonable juror could find that Taconic acted negligently in terminating Plaintiff, nor that Taconic "blindly credited" Pauv's comments in making its termination decision.

Third, Plaintiff's cites to NYS Appeals Board's determination that Plaintiff was eligible for unemployment benefits.  Pl. Opp. at 17.  However, as Defendants correctly note, these "unreviewed state administrative determinations do not have a preclusive effect on Title VII

16

cases." *See Shaolin Jiang v. Flushing Ctr. Inc.*, No. 06 Civ. 3729 (ERK) (LB), 2009 WL 9124372, at *7 (E.D.N.Y. Mar. 9, 2009) ("To the extent that plaintiff offers the unemployment decision to demonstrate that defendant's proffered reason for termination is a pretext for discrimination, the argument is unavailing."); *see also Raniola v. Bratton*, 243 F.3d 610, 623-24 (2d Cir. 2001) (citing *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 795 (1986) ("The Supreme Court has held that Congress, in enacting Title VII, generally intended to eliminate the binding effect of prior administrative findings and provide a *de novo* trial on Title VII claims.").

Assessing Plaintiff's evidence as a whole, the Court finds that Plaintiff is unable to rebut Defendants' legitimate nondiscriminatory reason for his termination. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim of race and color discrimination under Title VII.

### B. Hostile Work Environment

Plaintiff also alleges that Pauv's comments regarding Plaintiff's hair, attire, and work ethic, and his comparisons of Plaintiff with other black people in the neighborhood, are sufficiently pervasive to support a Title VII hostile work environment claim. Pl. Opp. at 17. To defeat summary judgment on a hostile work environment claim, Plaintiff must produce evidence that "the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment." *Brenner*, 2016 WL 4703889, at *2 (citing *Patterson v. Cty. of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004). The court must consider "all the circumstances," such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Miller v. Praxair, Inc.*, 408 F. App'x 408, 411 (2d Cir. 2010) (citing *Harris,* 510 U.S. at 23).

As an initial matter, Pauv's comments about Plaintiff's smoking habit, shoes, and work ethic were racially neutral and Plaintiff does not sufficiently allege that these comments were in fact discriminatory. *See Lioi v. New York City Dept. of Health and Mental Hygiene*, 914 F. Supp. 2d 567, 591 (S.D.N.Y. 2012) (quoting *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) ("While actions that are racially neutral on their face can be considered in assessing the totality of the circumstances for a hostile work environment claim, there must be some circumstantial or other basis for inferring that such incidents were in fact discriminatory.") (internal quotation marks omitted). Additionally, Pauv's alleged discriminatory comments concerning Plaintiff's dreadlocks – saying that Plaintiff had a lot of hair – and his resemblance to other African Americans with dreadlocks in the neighborhood simply do not amount to the "steady barrage of opprobrious . . . comments" sufficient to alter the conditions of Plaintiff's employment. *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."). Here, even assessing the evidence in the light most favorable to Plaintiff, Plaintiff is unable to show that Pauv's comments about Plaintiff's hair and Pauv's comparisons of Plaintiff to other individuals with dreadlocks, which occurred "three or four times" in 2009, unreasonably interfered with Plaintiff's work performance.

Moreover nothing in the record suggests that Pauv's comments were motivated by hostility towards African Americans. In fact, Plaintiff testified at his deposition that Pauv never

called him any derogatory names and that he had never heard Pauv make any comments about the race of anyone at work.  Def. 56.1 ¶¶ 91-92.  Though Plaintiff claims that Pauv complained about Plaintiff's performance as a superintendent, the record indicates that other managers made similar complaints.  *See id.* at ¶¶ 9-16.  Moreover, Plaintiff acknowledged that Pauv considered him "family" and that Plaintiff called on Pauv to lend him money to support his own family.  *Id.* at ¶ 90.

Viewing the evidence as a whole, the Court finds that Plaintiff is unable to show that Pauv's comments created a hostile work environment.  Accordingly, Defendants motion for summary judgment as to Plaintiff's hostile work environment claim under Title VII is GRANTED.

### C.  Retaliation

Plaintiff alleges that his March 8, 2012 termination was in retaliation for Plaintiff's complaints about Pauv.  Pl. Opp. at 19.  As the Court previously noted, retaliation claims pursuant to Title VII are also analyzed under the burden-shifting framework in *McDonnell Douglas*.  *See Jute*, 420 F.3d at 173.  Under the framework, a plaintiff alleging retaliation must first establish a *prima facie* case of retaliation.  *McDonnell Douglas*, 411 U.S. at 802.  To establish a *prima facie* case of retaliation, Plaintiff must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  Though at this stage, a plaintiff's burden is *de minimus*, "a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of [retaliatory] motive," *Bennett v. Watson Wyatt & Co.*, 136 F.

Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002), and "cannot meet this burden through reliance on unsupported assertions." *Goenaga*, 51 F.3d at 18.

Here, Plaintiff can, arguably, establish a *prima facie* case of retaliation because he complained to Pauv, his supervisor – putting Pauv on notice – about Pauv's comments relating to Plaintiff's dreadlocks and Plaintiff's disparate treatment with regard to assignments. Plaintiff also shows that Woodruff spoke to Pauv before Woodruff informed Plaintiff of his termination. *Cf. Little v. National Broadcasting Co., Inc.*, 210 F. Supp. 2d 330, 387 (S.D.N.Y. 2002) (finding that plaintiff sufficiently alleged retaliation claim where he complained to supervisor, supervisor was thus on notice, and supervisor's comments suggested retaliatory animus). However, Plaintiff's retaliation claim fails because Defendants have presented a legitimate, non-retaliatory reason for Plaintiff's termination. Plaintiff does not show, and nothing in the record indicates, that Defendants' proffered reason for Plaintiff's termination was pretexual.[5]

Accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### D.  State and City Claims

Defendants have also moved for summary judgment on Plaintiff's state and city law claims. Where, as here, all federal law claims are eliminated before trial, the "traditional 'values

---

[5] To support his retaliation claim, Plaintiff also contends that Taconic did not provide a "reasonable avenue" to complain about Pauv's discrimination. Pl. Opp. 19-20. However, this analysis is inapplicable here. Whether an employer provided a reasonable avenue of complaint is a consideration when a plaintiff wants to impute liability from a coworker to the employer. *See, e.g.*, *Howley*, 217 F.3d at 154 (noting that for imputing the conduct of a *coworker* to the employer, plaintiff must demonstrate that "the employer failed to provide a reasonable avenue for complaint") (emphasis added). Here, Pauv is Plaintiff's supervisor, not his coworker, and thus already an agent. As discussed previously, Pauv's actions can be imputed to Taconic through "cat's paw" liability, however, the record does not support this application. Moreover, Plaintiff could have complained directly to his Union.

of judicial economy, convenience, fairness, and comity' "weigh in favor of declining to exercise supplemental jurisdiction over any remaining state and city law claims. *Kolari v. N. Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having dismissed Plaintiff's sole federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state and city law claims. *See* 28 U.S.C. § 1367(c)(3). Thus, they are likewise DISMISSED.

## V.   Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 67, and close the case.

It is SO ORDERED.

Dated:   September 30, 2016
         New York, New York

Edgardo Ramos, U.S.D.J.